IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOLANDO HINTON,                        )
                                       )
            Plaintiff,                 )
    v.                                 )
                                       )    Civil Action No. 08-0685
PENNSYLVANIA STATE POLICE,             )
                                       )
            Defendant.                 )
                                       )

MEMORANDUM

Gary L. Lancaster,
Chief Judge.                                    August 30, 2010

        This is an action in employment discrimination.
Plaintiff, Jolando Hinton, alleges that defendant, Pennsylvania
State Police, retaliated against him in violation of Title VII of
the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq. ("Title
VII"), and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat.
§ 951, et seq. ("PHRA"). Plaintiff seeks monetary and equitable
damages as well as costs and attorneys' fees.

        Defendant has filed a motion for summary judgment [Doc.
No. 24] arguing that there are no genuine issues of material fact,
and that it is entitled to judgment as a matter of law. For the
reasons set forth below, the motion will be granted in part and
denied in part.


I.  BACKGROUND

        Unless otherwise indicated, the following facts are
undisputed. We construe all other facts in the light most
favorable to plaintiff, the non-moving party. We discuss

additional facts throughout the memorandum, where applicable.

Jolando Hinton ("Hinton") is an African-American police trooper who began working for defendant Pennsylvania State Police ("PSP") in 1991. Throughout this litigation, Hinton has continuously worked for PSP. His retaliation claim involves a series of incidents that span from approximately August of 2006 through June of 2009. During this time, Hinton contends that PSP retaliated against him for complaining both internally and to the Equal Employment Opportunity Commission ("EEOC") about racial discrimination. Specifically, Hinton claims that, in retaliation for his complaints of racial discrimination, PSP, inter alia, suspended him on two separate occasions, transferred him from Pittsburgh, Pennsylvania to Uniontown, Pennsylvania, subjected him to a psychiatric examination, placed him on limited duty status pending the outcome of that examination, stole his police badge and identification card and then accused him of losing those items and lying about it, and investigated the accuracy of some of his police reports ("ten-day daily reports") without any legitimate reason to do so.

PSP counters that it had legitimate, non-discriminatory reasons for its actions toward Hinton. PSP contends that it: (1) suspended Hinton for inaccurate reporting of a DUI arrest and failure to attend the preliminary hearing; (2) suspended him for failure to withdraw a traffic citation, which Hinton admits to; (3)

2

subjected him to a psychiatric examination and placed him on limited police duty status pending the outcome of that examination due to a change in his behavior and recent "paranoia" reported by fellow officers; (4) filed an internal complaint against him for failing to report his badge and identification card missing pursuant to PSP regulations and for providing false information when questioned about these items; and (5) investigated his arrest reports along with the reports of other PSP officers for accuracy regarding DUI and traffic arrests, motorist assists, written warnings, and vehicle inspections.

The relevant facts and circumstances surrounding each of the above incidents are set forth below.

A.    Suspension Relating to DUI Incident

On July 16, 2003, Hinton investigated a car accident where one driver was intoxicated (hereinafter referred to as the "DUI incident"). He reported the accident and arrest and filed charges against the intoxicated driver. Between August 12, 2003, and October 6, 2005, Hinton filed several supplemental reports, indicating that the charges against the intoxicated driver were "waived to court," meaning that the driver waived his preliminary hearing before the district magistrate judge. According to Hinton, one of his previous supervisors, Captain Joseph Pokorny ("Pokorny"), had informed him that the driver had waived the case to court.

Hinton concedes that the DUI charges were not, in fact, "waived to court," making his reports for the DUI incident inaccurate. According to Hinton, Pokorny died before Hinton discovered the error. Because Hinton failed to show up for the preliminary hearing, the driver was released from all charges. Hinton claims that as soon as he learned that the case had not been "waived to court," he brought it to the attention of his direct supervisor at the time, Corporal Kevin L. Brown ("Brown"). As a result, Brown initiated an internal investigation against Hinton regarding this incident. On August 2, 2006, PSP charged Hinton with providing false information on his reports and suspended Hinton for five days without pay.[1]

The very same day he was suspended, Hinton filed a union grievance which indicated that he knew of several co-workers who had committed worse offenses than he had and were not disciplined: "In closing, five days without paid [sic] is very severe and harsh without a fair investigation. I know of several members who have done worst [sic] with their investigations and reports." This grievance does not set forth any allegation that the alleged unfairness was racially motivated or that the co-workers who had committed worse offenses were a different race than Hinton.

---

[1]

After negotiations with the Pennsylvania State Troopers Association ("PSTA"), the PSP Grievance Committee reduced Hinton's suspension to three days. Hinton, however, refused to sign the pre-arbitration agreement because he believed the suspension to be discriminatory and unjustified.

4

According to Hinton, however, some time after the DUI incident and before he was suspended, he orally complained about racial discrimination to all of his superiors within his direct chain of command. Specifically, during his deposition, Hinton testified that he complained to Lt. Sheldon Epstein ("Epstein") about Trooper Thomas Armour ("Armour"), a Caucasian, who Hinton alleges failed to file charges in "a ton" of DUI cases. Likewise, Hinton testified that he complained to Brown and Sergeant David Penn ("Penn") that he was being disciplined for an offense for which a "white officer" was not disciplined. Hinton also testified that white troopers, such as Troopers Feher and Nassan did the same thing he did and were never disciplined for their conduct, although it is unclear from his testimony whether he mentioned these troopers to his supervisors at the time he complained. Hinton further testified that he complained about racial discrimination to Lieutenant M.L. Henry ("Henry"), who at the time was the director of PSP's equal employment office ("EEO"). Epstein, Brown, Penn, and Henry testified they have no recollection of Hinton making any such oral complaints of racial discrimination/disparate treatment based on race. None of these oral complaints are specifically set forth in plaintiff's complaint, nor were they ever written down. Nevertheless, Hinton claims he made these complaints, and his superiors should have reported them to the EEO, but they did not, in violation of PSP policies.

B.    Transfer

Shortly following the DUI incident and at the direction
of Captain Roger Waters ("Waters"), PSP transferred Hinton to
Uniontown, Pennsylvania for thirty days.  Waters had previously
alluded to the transfer when he filed the August 2, 2006
disciplinary action against Hinton for the DUI incident.  [Doc. No.
25, Ex. 9].  The transfer was effective as of September 23, 2006.

On October 21, 2006, PSP rescinded the transfer because
it was issued by Waters, not the Grievance Committee, in violation
of PSP policy.  In the interim, on September 25, 2006, Hinton had
filed a grievance in which he complained about the transfer.  That
grievance does not contain any allegation that the transfer was
racially motivated.  However, Hinton alleges that at some point in
time before the transfer was effective, he orally complained to
Penn that the transfer was racially motivated.  This oral complaint
was never specifically mentioned in Hinton's complaint or
memorialized in writing.

Penn testified he has no recollection of Hinton's alleged
oral complaint regarding the transfer.  Nevertheless, Hinton claims
that PSP transferred him in retaliation for his complaints of race
discrimination.

C.    Suspension for Failure to Withdraw Traffic Citation

On November 28, 2006, Hinton stopped a motorcycle
operator for driving alone in a High Occupancy Vehicle ("HOV")

lane. After Hinton learned that the operation of a motorcycle without a passenger in an HOV lane was permissible, he wrote a note on the citation, dated November 28, 2006, which indicated that the citation was issued "in error," and that prosecution was withdrawn on December 2, 2006.[2] Hinton signed his name directly below this note.

According to Hinton, some time around November 28, 2006, he orally informed both PSP personnel and the district magistrate's office that he intended to withdraw this citation. Hinton became ill before he actually withdrew the citation, and he contends that another officer was assigned to withdraw it. However, according to PSP, it believed that Hinton had already withdrawn the citation as his note indicated, and when PSP later discovered that he had not, PSP investigated Hinton's conduct relating to the citation. As a result, on June 7, 2007, Captain Lisa Christie ("Christie") charged Hinton with "dissatisfaction with performance of duty" and suspended him for twenty days (later reduced to two days) without pay.

D. Psychiatric Examination and Limited Duty Status

The record indicates that in late 2006, Brown, Hinton's direct supervisor at the time, informed Epstein that two unnamed troopers had expressed concerns that Hinton was acting paranoid, as

---

2

December 2, 2006 was a Saturday. PSP argues that it was impossible for Hinton to withdraw the citation that day because the district magistrate's office was closed.

7

if "everyone was out to get him." Sergeant Penn also expressed similar concerns to Epstein regarding Hinton's recent behavior.

On December 6, 2006, Epstein recommended in a written memorandum that Hinton undergo a psychiatric evaluation for purposes of determining his fitness for duty because: (1) unnamed members of PSP had expressed concern regarding his paranoia or belief that everyone "was out to get him"; (2) there had been recent disciplinary actions taken against him for placing "inaccurate information on official reports"; and (3) he recently changed his professional demeanor.

Around the same time Epstein made the request for Hinton to undergo a psychiatric examination to Waters, Hinton was calling in sick and not appearing for work. On December 8, 2006, PSP's psychologist, Dr. Michael Asken determined that, given the current circumstances, a psychological evaluation of Hinton was necessary. Dr. Asken discussed with Waters the need to place Hinton on medically limited duty and to confiscate his badge and weapon. At that time, Waters did not think that such actions were necessary. Dr. Asken referred Hinton to see Dr. Charles Berlin for the psychiatric examination.

From early December of 2006, until late January of 2007, Hinton was on sick leave.[3] When he returned to work, PSP placed

---

[3]

Hinton claims that he was denied proper use of his paid leave benefits for his sick leave.

8

Hinton on limited duty status, which required Hinton to surrender his badge and gun pending the outcome of his psychiatric evaluation, despite Waters' earlier assessment that such action was unnecessary.[4]

On February 16, 2007, Dr. Berlin examined Hinton. That same day, Dr. Berlin issued a report recommending that PSP restore Hinton to full-duty status. Dr. Berlin forwarded Dr. Asken a copy of his report on February 20, 2007, and on February 26, 2007, Dr. Asken issued a memorandum accepting Dr. Berlin's opinion and recommending that Hinton return to full-duty status as soon as feasible. It was not until April 9, 2007, however, that Brown reviewed these reports and ordered that Hinton return to full-duty status. There is no evidence in the record indicating why PSP delayed Hinton's return to full-duty status for more than a month.

E. Reporting Discrepancies Investigation

Then in February of 2009, one of Hinton's supervisors, Sergeant Paul D. Radadovitch ("Radadovitch"), investigated Hinton's "ten-day daily reports"[5] for accuracy regarding DUI and traffic arrests, motorist assists, written warnings, and vehicle

4

PSP contends that it placed Hinton on limited duty status in December of 2006. However, the record evidence indicates that the decision was not made until January 23, 2007. [See Doc. No. 30, Ex. Nos. P-17 & P-20].

5

Ten-day daily reports are electronic reports that troopers complete every ten days regarding their on the job activities, such as arrests made, traffic stops, etc.

9

inspections as compared to other statistical sources. On March 18,
2009, Radadovitch filed a complaint against Hinton for
intentionally falsifying statistics on these reports.

Hinton does not dispute that there may have been
inaccuracies contained within these reports. Rather, Hinton
contends that any such inaccuracies were not necessarily his fault.
According to Hinton, his immediate supervisor would sign off on
each of Hinton's ten-day daily reports and was responsible for
making any necessary corrections. Although Hinton contends that
Radadovitch had no legitimate reason for reviewing these reports
other than to retaliate against him for complaining about racial
discrimination, he also alleges that Radadovitch analyzed these
statistics to prepare Hinton's 2007-2008 Employee Performance
Review ("EPR"), which Radadovitch ultimately signed off on, and
Hinton received an overall satisfactory rating.

F.    Badge and Identification Card Incident

On March 2, 2009, the janitorial staff at the Pittsburgh
police station found Hinton's badge and identification card in the
station's conference room. The janitor gave the badge and card to
Corporal Michael Taylor ("Taylor"), who in turn gave these items to
Sergeant Scott ("Scott"), who eventually gave them to Radadovitch.
Radadovitch was to see Hinton during the midnight shift on March
17, 2009 (approximately two weeks later). Radadovitch planned to
return these items to Hinton at that time.

According to Hinton, he saw Taylor the same day the janitor found his badge and card, but Taylor made no mention of it. Hinton was on sick leave for several days when the janitor found the badge and card, and during that time he spoke to Scott on at least two occasions, but Scott did not mention anything about the badge and card. Because Hinton had been on sick leave, he contends he did not realize that his badge and identification card were not in his locker where he thought he had left them.

The parties dispute what exactly occurred during Hinton's meeting with Radadovitch, but it is clear that the meeting was confrontational. On April 2, 2009, Radadovitch wrote Hinton up for failing to report his identification card and badge as missing and for allegedly providing false information when questioned about these items during the meeting. Hinton disputes that he provided any false information to Radadovitch regarding this incident.

## II.  PROCEDURAL HISTORY

Hinton filed a charge of racial discrimination and retaliation with the EEOC on January 3, 2007, while he was on sick leave. He filed the instant complaint alleging racial discrimination and retaliation on May 19, 2008. [Doc. No. 1].

On May 14, 2009, pursuant to the parties' agreement, Hinton voluntarily withdrew all claims other than his claim for retaliation. [Doc. Nos. 22 & 23]. Shortly thereafter, PSP filed

11

the pending motion for summary judgment, contending that it is
entitled to judgment as a matter of law. [Doc No. 37].

At the pre-trial conference, the parties sought and
received additional time before trial to attempt to resolve this
dispute. After several months, their efforts were unsuccessful.
Therefore, PSP's motion is now ripe for adjudication.


III. STANDARD OF REVIEW

Summary judgment may be granted if, drawing all
inferences in favor of the non-moving party, "the pleadings, the
discovery and disclosure materials on file, and any affidavits show
that there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(c)(2).

The mere existence of some factual dispute between the
parties will not defeat an otherwise properly supported motion for
summary judgment. A dispute over those facts that might affect the
outcome of the suit under the governing substantive law, i.e., the
material facts, however, will preclude the entry of summary
judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986). Similarly, summary judgment is improper so long as the
dispute over the material facts is genuine. Id. In determining
whether the dispute is genuine, the court's function is not to
weigh the evidence or to determine the truth of the matter, but

only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 248-49.

The United States Supreme Court has "emphasized, [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (internal quotations omitted) (quoting Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). All inferences must be drawn and all doubts resolved in favor of the non-moving party. Weldon v. Kraft, Inc., 896 F.2d 793, 797 (3d Cir. 1990).

It is on this standard that the court has reviewed the instant motion for summary judgment and documents related thereto.

## IV. DISCUSSION

Although Hinton has remained employed by PSP throughout this litigation, he claims that PSP retaliated against him for making complaints of racial discrimination both internally and to the EEOC. Specifically, Hinton contends that as a result of his complaints of racial discrimination, PSP suspended him twice, transferred him, forced him to undergo a psychiatric examination,

13

restricted his employment to limited duty status, filed an internal complaint against him for allegedly losing his badge and identification card and allegedly lying about it when according to Hinton, PSP officers stole these items, and improperly investigated the accuracy of his reports and held him accountable for the inaccuracies. Because PSP took these actions against Hinton, Hinton claims he was forced to take time off of work without pay, and to use his sick time, leaving him unable to accumulate overtime pay to the extent he had in the past and therefore, entitling him to monetary damages.

PSP denies these allegations and moves for summary judgment on the basis that Hinton has failed to establish a prima facie case of retaliation. PSP argues that: (1) Hinton failed to engage in protected conduct prior to the time he filed his complaint with the EEOC on January 3, 2007, and (2) for the alleged adverse employment actions that occurred after Hinton filed his EEOC charge, Hinton cannot establish a causal link between his complaints of racial discrimination and PSP's actions. PSP further contends that, even if Hinton could establish a prima facie case of retaliation, he cannot point to any evidence of pretext to rebut PSP's proffered legitimate, non-discriminatory reasons for its actions.

Based on the evidence presented and for the reasons set forth below, we conclude that a reasonable jury could find that

14

some of PSP's actions were taken in retaliation against Hinton on the basis of some of his complaints of racial discrimination. Accordingly, PSP's motion for summary judgment is granted in part and denied in part.

A.  Prima Facie Case

Initially, we note that the same analysis applies to Hinton's Title VII claim and his PHRA claim for retaliation. Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996). Title VII protects individuals who engage in protected conduct from retaliation by their employers, making it "an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made unlawful by this subchapter ...."  42 U.S.C. § 2000(e)-3(a).[6]

To establish a prima facie case of retaliation, plaintiff must show that: (1) he engaged in a protected activity; (2) he was subsequently or contemporaneously subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action. Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006) (citation omitted); Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997) (noting that retaliation claims relying on indirect evidence

_____

6

It is similarly unlawful under section 5(d) of the PHRA for an employer "to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge ... under this act."  43 Pa. Cons. Stat. § 955(d).

15

are analyzed under the test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

If a plaintiff makes a prima facie showing of all three of the above factors, then the burden "shifts to the defendant to articulate some legitimate, nondiscriminatory reason" for its conduct.' Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citation omitted). The burden at this stage is relatively light. Defendant need not prove that its articulated reason actually motivated the discharge, as the ultimate burden of proving intentional discrimination is always on plaintiff. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (citing Burdine, 450 U.S. at 253).

Once an employer presents evidence of a legitimate reason for its actions, the burden shifts back to plaintiff to show that the proffered reason is pretext for discrimination. Iadimarco v. Runyon, 190 F.3d 151, 158 (3d Cir. 1999).

1. Protected Conduct

PSP does not dispute that the filing of Hinton's EEOC complaint on January 3, 2007 constitutes "protected conduct." PSP contends, however, that Hinton's internal complaints, both written and oral, prior to filing his EEOC charge, do not amount to protected activity under Title VII.

The Court of Appeals for the Third Circuit does not require a formal letter of complaint to an employer or to the EEOC as

16

evidence of protected conduct. "[C]omplaints ... whether oral or written, formal or informal, are sufficient to satisfy the first prong of the prima facie case, provided the complaints expressed [plaintiff's] opposition to a protected activity." Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001) (finding plaintiff established prima facie case of retaliation).

Hinton's written, "pre-EEOC charge" grievances regarding the DUI incident and his transfer do not contain any allegation of racial discrimination or retaliation. Rather, in those grievances, Hinton complains generally that PSP treated him differently than other troopers. It is well-settled that general complaints of unfair treatment do not constitute "protected activity" under Title VII. See Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995) (finding that plaintiff's letter complaining about unfair treatment in general and expressing dissatisfaction with employment conditions did not constitute the requisite "protected conduct" for a prima facie case of retaliation); Seldon v. Nat'l R.R. Passenger Corp., 452 F. Supp. 2d 604, 610 (E.D. Pa. 2006) (general expressions of dissatisfaction do not constitute protected activities). Accordingly, these written grievances do not constitute protected activity under Title VII.

However, Hinton also contends he made oral complaints to his supervisors of racial discrimination prior to the filing of his

EEOC charge. The only evidence of such complaints is found in Hinton's deposition testimony from April 22, 2009, where Hinton testified that he complained to Penn, Epstein, Waters, and Brown that he believed his discipline was unfair because there were white officers who had been treated differently than him. [Doc. 30, Ex. P-2]. Hinton also testified that other white troopers, engaged in the same conduct that he did and were never disciplined for their conduct. Neither the specifics nor timing of these complaints are specified in the records. Similarly, absent from the record is any evidence that Hinton mentioned the names of specific troopers in any of his complaints to supervisors. Furthermore, Hinton testified that he orally complained about racial discrimination to Henry, PSP's EEO director at the time. [Id.]. Again, the timing and specifics of that complaint are unclear from the record. On the other hand, Penn, Epstein, Waters, Brown, and Henry all testified that they have no recollection of Hinton orally complaining to them about racial discrimination.

Viewing this evidence in the light most favorable to the non-moving party, Hinton, if a jury were to believe Hinton's account of the events, then Hinton's oral complaints of racial discrimination would constitute protected activity. See Curay-Cramer v. Ursuline Acad. of Wilmington, Del. Inc., 450 F.3d 130, 135 (3d Cir. 2006) ("When deciding whether a plaintiff has engaged in opposition conduct, we look to the message being conveyed rather

than the means of conveyance.").[7] Accordingly, if a jury were to find Hinton's testimony credible, it would have to conclude that Hinton engaged in protected activity when he orally complained of racial discrimination to his superiors at PSP prior to the filing of his EEOC charge.

2. Adverse Employment Actions

Hinton next contends that he suffered several adverse employment actions as a result of his complaints of racial discrimination. Specifically, Hinton argues that, in retaliation for his complaints of racial discrimination, PSP: (1) suspended him twice; (2) transferred him; (3) subjected him to an involuntary psychiatric examination; (4) placed him on limited police duty status; (5) filed an internal complaint against him; and (6) launched an internal investigation of his police reports.[8] As a result of these actions, Hinton contends that PSP denied him

[7]
PSP's argument that Hinton's complaints are "too attenuated" to survive summary judgment [Doc. No. 26, at p. 6] goes to the weight of such evidence, which is an issue for the fact-finder.

[8]
Until December of 2005, the evidence indicates that Hinton received primarily satisfactory grades on his performance reviews. In his review dated January 30, 2007, for the period from December of 2005 through December of 2006, Hinton received an overall grade of "needs improvement." However, Hinton does not contend that PSP's poor performance evaluation of him constitutes an adverse employment action. [Doc. No. 31, at p. 22]. For this reason, the court does not analyze it as such.

19

overtime pay[9] and forced him to use his sick leave that he would have otherwise been compensated for at his retirement.

To establish an adverse employment action, plaintiff must demonstrate that defendant's retaliatory conduct had some material, employment related impact. Jones v. Phila., 198 F.3d 403, 412-13 (3d Cir. 1999) (finding sufficient adverse employment actions where a school assigned plaintiff to teach what he considered "less desirable" science classes, and noting that employment decisions such as transfers and demotions constitute adverse employment decisions). "Retaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Riding v. Kaufmann's Dept. Store, 220 F. Supp. 2d 442, 464 (W.D. Pa. 2002) (emphasis and citations omitted).

We find that the suspensions, transfer, psychiatric examination, and placement of Hinton on limited duty status constitute adverse employment actions. See Clarkson v. Pennsylvania State Police, No. 99-783, 2000 WL 1513773, at *6 (E.D. Pa. Oct. 10, 2000) (granting summary judgment on all claims except

---

[9]

Over the course of a nearly four-year period from January 16, 2005 until November 11, 2008, Hinton received more than 1,200 hours of overtime. He received no overtime from November 28, 2006 through April 23, 2007, but was on sick leave from early December of 2006 through January 22, 2007. Hinton has also testified that he took at least a few more days of sick leave in March of 2007.

20

retaliation). Although PSP currently employs Hinton, his suspensions, transfer, psychiatric evaluation, and placement on limited duty status altered the compensation, terms, and conditions of employment. These actions resulted in less compensation for Hinton. They also forced Hinton to work in less desirable positions, e.g., limited duty status. Accordingly, we find that these PSP employment actions constitute adverse employment actions under Title VII.

   3. Causation

To establish a prima facie case of retaliation, plaintiff must demonstrate a causal connection between his participation in a protected activity and the adverse employment action. Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir. 1995). A court considers a broad array of evidence in assessing whether a causal link has been shown to survive a summary judgment motion. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 285-86 (3d Cir. 2000). The existence of a causal link "must be considered with a careful eye to the specific facts and circumstances encountered." Id. at 279 n.5 (citation omitted). "Evidence probative of a causal link can be inferred from evidence 'gleaned from the record as a whole.'" Aguiar v. Morgan Corp., 27 Fed. App'x 110, 112 (3d Cir. 2002)(per curiam) (citing Farrell, 206 F.3d at 279 n.5).

To determine whether a causal connection exists between protected conduct and an adverse employment action, courts consider

a number of factors, including: (1) the temporal proximity between the protected conduct and the employment action; (2) ongoing antagonism; (3) the employer's inconsistent statements regarding its employment decision; and (4) any other evidence from the record as a whole that is sufficient to establish a causal link.   See Farrell, 206 F.3d at 280-81.

The traditional means of showing causation is to demonstrate a close temporal proximity between protected activity and an adverse employment action.   See Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989).   While no bright-line rule exists, temporal proximity between the protected conduct and an adverse employment action must be "very close" under the circumstances. Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (finding EEOC's right to sue letter to employee three months before employee's supervisor announced employee's transfer was insufficient to establish causation); Fasold v. Justice, 409 F.3d 178, 189 (3d Cir. 2005) (holding that nearly three months may suffice to demonstrate a causal link).   However, close temporal proximity between protected activity and an adverse employment action alone, does not give rise to an inference of causation. Quiroga v. Hasbro, Inc., 934 F.2d 497, 501 (3d Cir. 1991).   Rather, plaintiff must show additional evidence, such as discriminatory animus, in order for the court to infer discrimination.   Weston v. Commw. of Pennsylvania, 251 F.3d 421, 432 (3d Cir. 2001).

22

Although the record is unclear as to exactly when Hinton's alleged oral complaints of racial discrimination took place, Hinton's testimony suggests that these complaints were made within close temporal proximity to Hinton's suspension regarding his inaccurate DUI reports and his transfer. The individuals who allegedly received Hinton's complaints were his superiors, and therefore, were in a position from which they may have affected Hinton's discipline. For these reasons, we find that Hinton's oral complaints are sufficiently linked to PSP's suspension and transfer of him in the fall of 2006 to establish causation.

Likewise, in early December of 2006, only a couple of months after Hinton's alleged oral complaints of racial discrimination, PSP subjected Hinton to a psychiatric examination. Around that same time, Epstein filed a complaint against Hinton regarding his improper HOV citation. Shortly thereafter, and less than three weeks after Hinton filed his EEOC charge, PSP placed Hinton on limited duty status.

Accordingly, the antagonistic nature of the above PSP actions combined with their temporal proximity to Hinton's complaints of racial discrimination is sufficient to establish the requisite causation for a prima facie case of retaliation.

On the other hand, with respect to later PSP actions regarding Hinton's badge and identification card as well as PSP's investigation of Hinton's ten-day daily reports, Hinton has failed

to establish causation. These actions took place in February and March of 2009, more than one-and-a-half years after Hinton filed his EEOC charge and nearly one year after he filed the complaint in this action. Given the lack of temporal proximity and other evidence linking Hinton's protected conduct (his complaints of racial discrimination) to these events, Hinton has failed to establish the requisite causation for a prima facie case of retaliation relating to these events.

Accordingly, we find that Hinton has set forth a prima facie case for retaliation, that PSP retaliated against Hinton for his alleged complaints of racial discrimination by: (1) suspending and transferring Hinton in the Fall of 2006; (2) conducting a psychiatric examination which resulted in Hinton being placed on limited duty status pending the outcome of the psychiatric examination; and (3) suspending Hinton regarding the HOV citation incident. Our analysis, however, does not end here. PSP has set forth reasons for its actions, which we address below.

## B. Legitimate, Non-Discriminatory Reasons for Actions

PSP claims that the "adverse" actions it took toward Hinton – the suspensions, transfer, psychiatric evaluation, and placement on limited duty status - were warranted. The law is clear that once plaintiff has established a prima facie case of retaliation, the burden shifts to defendant to offer rebuttal evidence demonstrating legitimate, non-retaliatory reasons for the actions

24

taken against plaintiff.  <u>Jones</u>, 198 F.3d at 410.

According to PSP, Hinton's first suspension, as well as his transfer, resulted from his submission of inaccurate reports relating to the DUI incident and his failure to attend the preliminary hearing regarding the same.  Although the transfer was later deemed to have been issued by the wrong supervisor, PSP had a legitimate, non-discriminatory reason for issuing it at the time as well as for suspending Hinton for submitting inaccurate information.[10]

With respect to PSP's psychiatric examination and placement of Hinton on limited duty status, PSP contends that in early December of 2006, several officers (some named and some unnamed) advised Captain Epstein that Hinton was acting paranoid, as if "everyone was out to get him."  At that time, Hinton was calling in sick and not showing up for work, which led supervisors to rightfully wonder whether something was wrong with Hinton.  As a result, PSP contends that on December 6, 2006, Epstein wrote a memorandum to Waters requesting that Hinton undergo a psychiatric evaluation for purposes of determining his fitness for duty.  PSP placed Hinton on limited duty status pending the outcome of that examination. According to section 2.08A of PSP's duty requirements,

---

[10]

PSP admits that the transfer was improperly implemented because Captain Waters, as opposed to PSP's department disciplinary officer, implemented the transfer.

25

PSP has the right to subject its officers to psychiatric examination when it has "reasonable grounds to believe that a member ... is being influenced by a medical or psychiatric condition." [Doc. No. 30, Ex. 21]. Reports from multiple fellow officers and a sudden change in attendance meets the standard and provides a legitimate, non-discriminatory reason for the psychiatric evaluation.

Regarding the HOV citation incident, Hinton wrote a note on the back of the citation stating that prosecution was withdrawn on November 28, 2006. It is undisputed that Hinton never actually withdrew the citation. When PSP learned that Hinton had not withdrawn the citation, it initiated an internal investigation against Hinton for providing false information regarding that traffic citation. As a result, PSP charged Hinton with dissatisfaction with performance of duty, and suspended him for twenty days (later reduced to two days) without pay on June 7, 2007. Hinton's failure to withdraw the citation, as indicated by Hinton, was a legitimate, non-discriminatory reason for the suspension.

Accordingly, we find that PSP has met its burden to offer facially legitimate, non-discriminatory reasons for each of the adverse employment actions taken against Hinton. We next turn to Hinton's claim that such reasons are a pretext for racial discrimination.

26

C.  Pretext

Once defendant offers evidence of legitimate reasons for adverse employment actions, plaintiff gets the opportunity to demonstrate that the reasons offered are pretextual.  Jones, 198 F.3d at 410. In other words, plaintiff must point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either: (1) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action; or (2) disbelieve the employer's articulated legitimate reasons.  Fuentes, 32 F.3d at 764.  The court "may still consider the evidence establishing plaintiff's prima facie case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (citation and quotations omitted).

Hinton has challenged PSP's legitimate, non-discriminatory reasons for its action on the grounds that PSP's actions were either: (1) contrary to its policies and procedures, or (2) within its discretion, and that discretionary matters were always decided against Hinton in retaliation for his engagement in protected activities.

We conclude that, to some limited extent, Hinton has offered sufficient evidence of pretext to survive PSP's motion for summary judgment.  However, we also find that Hinton has failed to

establish pretext with respect to certain PSP actions.

At the summary judgment stage, where plaintiff asserts
pretext, i.e., that defendant's proffered reasons are not worthy of
belief, the court "must determine whether plaintiff has cast
sufficient doubt upon the employer's proffered reasons to permit a
reasonable fact-finder to conclude that the reasons are
incredible." Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d
1061, 1072 (3d Cir. 1996) (en banc); see, Fuentes, 32 F.3d at
764-65 ("[T]he non-moving plaintiff must demonstrate such
weaknesses, implausibilities, inconsistencies, incoherencies, or
contradictions in the employer's proffered legitimate reasons for
its action that a reasonable fact-finder could rationally find them
'unworthy of credence....'") (quoting Ezold v. Wolf, Block, Schorr
& Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).

As to PSP's actions in the Fall of 2006, Hinton argues
that PSP's actions were simply not justified, and that his
superiors violated PSP policies by not reporting his oral
complaints of racial discrimination. Hinton argues that his
transfer was retaliatory in nature, and that PSP's claim that the
transfer was issued in error is an effort to hide its
discriminatory animus. However, other than his own self-serving
testimony, Hinton sets forth no evidence to support this claim.
The record is void of any evidence that would cause a reasonable
jury to disbelieve PSP's articulated reasons for its suspension and

transfer of Hinton, albeit issued by the wrong person, in the Fall of 2006.

Hinton further argues that although his reports relating to the 2006 DUI incident were inaccurate and he failed to attend the preliminary hearing, he should not have been suspended for this conduct because: (1) he brought his reporting inaccuracies to the attention of his supervisors as soon as he learned of them, which according to Captain Byron Locke ("Locke") is a mitigating factor; (2) other troopers who are Caucasian and who have engaged in the same or worse behavior were not disciplined to the same extent and in the same manner; and (3) from January 1, 2005, through December 31, 2008, not one officer at PSP's Pittsburgh station, other than Hinton, was disciplined for failure to appear at a DUI hearing.

PSP concedes that "[t]roopers from time to time miss scheduled hearings ....[,]" however, this concession does not negate PSP's legitimate, non-discriminatory reason for suspending Hinton. It is undisputed that Hinton prepared an inaccurate police report and failed to attend a hearing. The fact that not every PSP officer has been suspended for missing a hearing and that Hinton took measures to mitigate his punishment does not refute PSP's legitimate reason for its conduct. Moreover, Hinton's vague testimony regarding other Caucasian troopers not being punished for the same conduct, is not enough to rebut PSP's legitimate, non-discriminatory reasons. Accordingly, PSP's motion for summary

judgment is granted as to the DUI incident and the transfer.

With respect to Hinton's involuntary psychiatric examination and placement on limited duty status, timing strongly supports Hinton's position that PSP's actions were retaliatory in nature. Specifically, once Hinton returned from sick leave toward the end of January of 2007 (after he filed his EEOC charge), Captain Waters placed him on limited duty status pending the outcome of Dr. Berlin's psychiatric examination. The record indicates that Captain Waters had already determined, before Hinton filed his EEOC complaint, that such action (*i.e.*, placing Hinton on limited duty status) would not be necessary.

Furthermore, Hinton's psychiatric examination took place on February 16, 2007. Dr. Asken recommended that Hinton return to full-duty status on February 26, 2007. Hinton was not placed on full-duty status until April 9, 2007. PSP provides no explanation for this delay. A reasonable juror could find that PSP's delay in returning Hinton to full-duty status may be due to discriminatory animus. Therefore, we find that there is a genuine dispute of material fact as to whether PSP's placement of Hinton on limited duty status and delay in returning Hinton to full-duty status was in retaliation for filing an EEOC complaint.

Hinton further contends that his suspension for the HOV citation incident was the result of retaliation. In support of this position, he relies on the findings of the arbitrator from his

30

grievance of his suspension. While the arbitrator's findings may support other evidence of an intention to retaliate against Hinton on the basis of complaints of racial discrimination, such evidence is inadmissible, and even it were admissible, standing alone, is not enough to overcome PSP's legitimate reasons for its conduct.[11] Moreover, Hinton admits that he signed a note on the back of the citation indicating that prosecution on it had been withdrawn, yet he never actually withdrew it. His unsupported contention that he assigned it to another officer to withdraw, and that he orally withdrew the citation, do not create a genuine issue of material fact as to PSP's legitimate, non-discriminatory reason for suspending Hinton as a result of this incident. Based on the foregoing, as to the HOV citation incident, Hinton has not cast sufficient doubt on PSP's reasons such that a reasonable fact-finder may conclude that Hinton's reasons are credible.

## V. CONCLUSION

For the foregoing reasons, we conclude that a reasonable juror could find in favor of Hinton on his retaliation claim as to

---

[11]

In addition, Hinton seems to argue that PSP's refusal to grant his request for a hardship transfer is evidence of discriminatory intent. [Doc. 30, Ex. 32]. We disagree. PSP has the authority to summarily grant or deny transfer requests by its employees. Hinton presents no evidence that PSP's denial of his request for a transfer was causally linked to his complaints of racial discrimination. Accordingly, such an argument lacks merit.

PSP's placement of Hinton on limited duty status and PSP's delay in reinstating Hinton to full-duty status. As such, PSP's motion for summary judgment will be granted as to all other employment actions and denied as to PSP's placement of Hinton on limited duty status and delay in returning him to full-duty status.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOLANDO HINTON,                          )
                                         )
        Plaintiff,                       )
                                         )
    v.                                   )
                                         )    Civil Action No. 08-0685
                                         )
PENNSYLVANIA STATE POLICE,               )
                                         )
        Defendant.                       )
                                         )

ORDER

AND NOW, this 30th day of August, 2010, upon consideration

of defendant's motion for summary judgment [Doc. No. 24] and the

documents filed in support and opposition thereto, IT IS HEREBY

ORDERED that the motion is GRANTED IN PART and DENIED IN PART. For

the reasons set forth in the attached memoranda, it is a question

for the jury whether, in retaliation for plaintiff filing a

complaint with the EEOC in early January of 2007, defendant placed

plaintiff on limited duty status in January of 2007 and delayed in

returning him to full-duty status until April of 2007, when

plaintiff had been cleared by a physician to return to full-duty

status as of February 26, 2007.

BY THE COURT:

_____ C.J.

cc:  All counsel of record